UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
(electronically filed)

UNITED STATES OF AMERICA PLAINTIFF

V. CRIMINAL ACTION NO. 3:26-CR-90-CHB

LAJUAN SANDERS DEFENDANT

**REPLY IN SUPPORT OF MOTION FOR REVIEW AND REVOCATION OF ORDER OF DETENTION (DN 57)**

*** *** ***

Comes the defendant, Lajuan Sanders, through counsel, and replies to the United States' Response (DN 60) to his Motion for Review and Revocation of Order of Detention (DN 57). The Response rests on a misstatement of the central intercepted call, an unsupported reading of Morris's secondhand accounts, and an evidentiary argument that does not apply at a detention hearing. In reply, Mr. Sanders states the following:

**I. The Response misstates the April 15 call on which its argument depends.**

The Response asserts that on April 15, 2026, "the Defendant called Morris and after discussing his trial he repeatedly requested that Morris come to his house to meet with him." (DN 60, PageID #: 326, citing TT2 Session 393.) The government's own linesheet shows otherwise. Session 393 is listed as "Direction: Outgoing" from Morris's phone, and the monitor summarized it as "MORRIS to UM8185." (USA-002441). Morris placed the call. In it, Mr. Sanders talked about his trial: that the agent had lied, that there were no fingerprints, and that he would not take the stand. He said once that he needed to see Morris because a friend was "tripping." He made no repeated requests, and nothing in the call refers to drugs. (*Id.*). This matters because the government builds everything that follows on it. Its theory is that Mr.

Sanders summoned Morris to sell him drugs in the middle of his own trial. The recorded call shows instead that Morris reached out to a man on trial and that the conversation was about the trial.

## **II. Morris's retellings do not establish criminal activity on release by clear and convincing evidence.**

**A. The government's reading of Morris's accounts rests on counsel's assertion alone.** The Response asserts that "there are no inconsistencies" in Morris's descriptions because "'one' or 'something' are ways to describe one pound of marijuana." (DN 60, PageID #: 326). No declaration, agent testimony, or intercepted call supports that reading. It is the assertion of counsel, offered to make four different retellings fit together. Of the four calls the government cites, only one names any substance. In the others, Morris says Mr. Sanders "asked MORRIS if he wanted one" (USA-002442) or "tried to sell him something" (USA-002456; USA-002478), without saying what. The government cannot fill those gaps by assumption and then call the result clear and convincing evidence.

What the accounts do share is that, in every version, Morris says he declined, and that Morris was openly hostile to Mr. Sanders. In the one call that names a substance, Morris also calls Mr. Sanders "stupid" and says he hopes Mr. Sanders gets "80 years." (USA-002461–62.) From these secondhand accounts, the government concludes that it is "highly probable" Mr. Sanders possessed a pound of marijuana. (DN 60, PageID #: 326). That conclusion is an inference built on an interpretation of a hostile co-defendant's retelling, not clear and convincing evidence.

**B. The complete wiretap record contradicts Morris's claims.** The native wiretap files show every session on Morris's phone, including the sessions agents marked non-pertinent and left out of the linesheets. They show the following for the trial week:

1. On April 14, the first day of trial, Morris told James Moorman at 1:24 p.m. that he had "just called Juan" and told him he "need[ed] to come and see him." (USA-002398–99.) Morris's only call to either of Mr. Sanders's phones that day before that statement was TT2 Session 300, placed at 1:13 p.m. It is logged "No connection." Morris did not speak with Mr. Sanders before making that claim.
2. Across the entire trial week, April 13 through 16, the only completed contacts between Morris's phone and Mr. Sanders's phones were these: a call on the eve of trial about having a drink (Session 236); a call on the evening of April 14 noting that Mr. Sanders had court the next day (Session 332); the April 15 call, placed by Morris, about the trial (Session 393); and a text on April 16 reading "Not guily" (Session 457). None refers to drugs. [Attach the contact log as Exhibit C if desired.]

The government also observes that the charged conspiracy period overlaps Mr. Sanders's prior release. It overlaps by four days, April 13 through 16, 2026, and the record for those four days is the one described above. The Response refers to Mr. Sanders's having offended while on "supervised release." (DN 60 PageID #: 326). It was not. He was on pretrial release, during which he is presumed innocent, in a case that ended in his acquittal. During that release he complied with location monitoring for five months and appeared at every proceeding, including all three days of trial.

**III. The co-conspirator rule is beside the point and would not apply anyway.**

The Response devotes a section to arguing that Morris's statements are not hearsay under Federal Rule of Evidence 801(d)(2)(E). At a detention hearing, "[t]he rules concerning admissibility of evidence in criminal trials do not apply." 18 U.S.C. § 3142(f). Mr. Sanders has never argued that the Court cannot consider Morris's statements. He argues that they are unreliable and do not carry the government's burden. Admissibility does not answer that.

In any event, the rule would not reach these statements. Morris telling third parties, after the fact, that he turned down an offer, that Mr. Sanders is "stupid," and that he hopes Mr. Sanders gets "80 years" is a narrative of past events and personal commentary. It does not advance any conspiracy. *See, United States v. Darwich*, 337 F.3d 645, 657 (6th Cir. 2003). A declined offer is, if anything, evidence that there was no agreement that week. And the rule itself provides that the statement "does not by itself establish . . . the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2). The government points to nothing from the trial week other than Morris's own uncorroborated words.

**IV. The May calls are post-acquittal and are described incompletely.**

The May 4 and May 16 calls the Response quotes took place after the acquittal. They have no bearing on whether Mr. Sanders committed crimes while on release. They go only to the weight of the evidence, which in this context concerns dangerousness, not guilt. *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). Even on their own terms, the excerpts leave out context found in the government's own report (attached to the Response):

1. On May 4, before the language the Response quotes, Morris said he had just woken up and did not feel well. After it, Mr. Sanders told him: "We'll take a shot

or two, then go back home and sleep, and get you some rest," and, "you need to just start exercising . . . . Start walking around." (USA-000024–25.)

2. On May 16, Mr. Sanders told Morris at 12:37 p.m. that he was "out in the country." When Morris's truck arrived near Shumake Court at 5:32 p.m., Morris called Mr. Sanders's phone, and **the call was not answered**. Morris left five minutes later. (USA-000026–27, ¶¶ 7, 10.) The report does not say that anyone saw the two men meet. The Response's description of a "short stay at Shumake Court" leaves out the unanswered call.

**V. The Response's other points do not meet the government's burden.**

**A. New information.** The Response says the motion "offers no new or different information." (DN 60, PageID #: 324) The detention hearing was held July 31, 2026. The linesheets summarized in the motion were produced on August 7. The government's supplemental production of October 26, 2026, included the arrest and search reports for both properties; neither lists any controlled substance seized. (USA-039266–71; USA-039306–08.) None of the laboratory reports produced involves any item seized from Mr. Sanders or from either property. (USA-039599–039751.) The native wiretap data discussed in Part II was not before the Magistrate Judge either. All of this is new information that has "a material bearing" on the question of conditions. 18 U.S.C. § 3142(f)(2).

**B. Criminal history.** The Response says Mr. Sanders has "four felonies in two cases." One of those is a persistent felony offender finding, which under Kentucky law is a sentencing status, not a separate offense. Mr. Sanders has only three felonies from two cases, not four. *See*, KRS 532.080; and, *Moore v. Commonwealth*, 637 S.W.3d 868 (Ky. 2025). Mr. Sanders' only conviction involving violence is twenty-eight years old.

**C. The proposed custodian.** The Response calls attention to Ms. Elliott's failure to appear on a traffic citation. According to online court records, Ms. Elliott did show up for arraignment on the traffic citation. Ms. Elliott has relayed to undersigned counsel that she did show up for the further proceedings, but had her granddaughter (whom she takes care of) with her and so was not allowed in the courtroom. Her paperwork was taken to the judge by the sheriff and she was told she would receive another date. She never received notice of another date. She was able to renew her license in July 2026 and thought nothing more of the case until the Response in this matter referenced the case. She has since that time gone back to court and gotten a new court date in December to finally resolve the issue. As to her statements at the scene, she was woken by agents forcing entry at 6:00 a.m. and placed in handcuffs while wearing nothing but underwear and a tank top. She did give law enforcement her license and her phone number before she left, she was just caught off guard, half-dressed in the wee hours of the morning and gave a sassy answer. Ms. Elliott is prepared to address those circumstances, her relationship with Mr. Sanders, and her duties as custodian at the hearing.

**D. Employment.** Game Bred Realties, LLC was administratively dissolved for failing to file a 2025 annual report, a paperwork lapse. Paperwork has been filed to request a reinstatement of the business. Mr. Sanders's work in renovations and in managing his own properties is not inconsistent; it is the same work. The government's own intercepts show him arranging HVAC work at his Hill Street property in July. (USA-003423; USA-003428; USA-003437–38.)

## <u>VI. Detention is preventing meaningful review of the evidence.</u>

The Response says Mr. Sanders "has been provided a digital copy of the discovery, a computer with which to access it, and a one hour at a time slot to review." (DN 60, PageID #: 329). The first drive counsel mailed on September 11 never reached him. He first viewed any

discovery on October 21, after counsel hand-delivered a second drive. Since then, as of the filing of this Reply, he has not been offered another opportunity to view the Discovery on one of the facility's two shared computers. The government's case against him is built almost entirely on its interpretation of intercepted calls. Morris's principal phone alone produced 3,792 recorded sessions, and there are several other target lines. Under the protective order, Mr. Sanders cannot be given copies of the recordings, so he can hear them only in counsel's presence

These circumstances are not "inherent inconvenience[s]" that every detained co-defendant shares. Mr. Sanders is alleged to be the source of supply, and the evidence against him is recorded calls as interpreted by agents. He is the person best able to explain what those words meant. The government's alternative, a continuance, would make him buy preparation time with more pre-trial detention. And although counsel is appointed, the hours needed to review the audio with him at the jail, and the cost of any paper copy, are borne by public funds. These are the considerations the Sixth Circuit has identified as relevant under § 3142(i). *United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

**<u>Conclusion.</u>**

The Magistrate Judge found no risk of flight and did not find the weight of the evidence strong. The one case-specific basis for the dangerousness finding, criminal activity while on release, rests on the prosecutor's interpretations of Morris's retellings of previous events. The full record does not support it. Mr. Sanders has met his burden of production, and the government has not shown by clear and convincing evidence that no condition or combination of conditions, including home incarceration with location monitoring, a custodian, no contact with co-defendants, no firearms, and restrictions on telephones, will reasonably assure the safety of the community.

WHEREFORE, Mr. Sanders respectfully requests that the Court revoke the Order of Detention (DN 28), and release him on the conditions proposed in his motion or such other conditions as the Court deems appropriate. In the alternative, he requests temporary release under 18 U.S.C. § 3142(i), or an order ensuring meaningful access to the discovery, including the recordings, at the facility where he is held.

Respectfully Submitted,

s/ Tricia Lister____
Tricia Lister
600 West Main Street, Ste 100
Louisville, KY 40204
(502) 235-9841
Counsel for Mr. Sanders

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2026, the foregoing reply was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Tricia Lister
Tricia Lister